UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| QUESTCARE, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 12-92-ART |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL POYNTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| SANDRA PRICE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 12-93-ART |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| MICHAEL POYNTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The complaints in these two cases tell a tale of government corruption fit for Boss Hogg's administration. The plaintiffs, an ambulance company and its employees, allege that the defendants, members of a state licensing board, engaged in significant chicanery to drive them out of business. *See* No. 12-92, R. 18 at 9 ¶ 42.[1]  While the plaintiffs may be correct that the board treated them unfairly, their claims are not cognizable under the federal Due Process Clause.

_____

[1] Since this Memorandum Order and Opinion addresses two separate cases, the Court will use an abbreviated citation system to indicate citations to each docket. *Questcare, LLC v. Poynter*, No. 7:12-cv-92 (filed Aug. 17, 2012), will be cited as "No. 12-92, R. __ at __." *Price v. Poynter*, No. 7:12-cv-93 (filed Aug. 17, 2012), will be cited as "No. 12-93, R. __ at __."

## BACKGROUND

Questcare EMS provides ambulance services in four Kentucky counties:  Floyd, Johnson, Magoffin, and Pike counties.  *See* No. 12-92, R. 18 at 3 ¶ 9.  It owns licenses to operate in those four counties as well as Martin County, though Questcare does not perform runs in Martin.  *See id.* at 3–4 ¶¶ 11–15.  Those state-issued licenses are necessary to operate an ambulance service in Kentucky, and the Kentucky Board of Emergency Medical Services ("KBEMS") issues and regulates those licenses.  *Id.* at 1 ¶ 1.  In doing so, KBEMS conducts random inspections of license holders to ensure that they are in compliance with safety regulations.  Questcare had passed all its KBEMS inspections until April 20, 2012.  *Id.* at 9 ¶¶ 43–44.  According to Questcare's complaint, April 20 marked the beginning of a long, Kafkaesque encounter with KBEMS in which Questcare was subject to improper investigations, one-sided hearings, and a panel set on suspending its license.

***Initial Inspections:***  On that day, KBEMS's Lewis Prewitt filed a complaint against Questcare.[2]  *Id.* at ¶ 43.  His complaint alleged that:  (1) two Questcare employees' state certification had expired, and (2) Questcare had various, unspecified "vehicle identification irregularities."  *Id.* at ¶ 46.  Questcare terminated both uncertified employees the day of the inspection.  *Id.* at ¶ 47.  KBEMS conducted another unannounced inspection a month later.  *Id.* at 10 ¶ 49.  Based on these two inspections, KBEMS scheduled a Temporary Suspension Panel hearing for July 5 to determine whether to suspend Questcare's licenses, *see id.* at ¶ 53.

---

[2] The complaint did not specify who Lewis Prewitt was.  *See* No. 12-92, R. 18 at 9 ¶ 43.  For the sake of narrative clarity, the Court takes judicial notice of his role at KBEMS.  *See* Kentucky Board of Emergency Medical Services, *KBEMS to Review Certification Testing Process*, http://kbems.kctcs.edu/News%20and%20Events/ newsItem?id=%7BCADBB5D4-C015-4214-80A6-F94F377B5FDF%7D (last visited, March 1, 2013).

*First Hearing:* Questcare did not learn of the hearing until they received a letter from KBEMS on July 2, 2012. *Id.* Questcare asserts that this lack of notice violated Kentucky regulations requiring: (1) a written submission of identified regulatory violations, and (2) ten working days for the provider to prepare and submit a written plan to address the violations. *Id.* at 10–11 ¶¶ 50–56 (citing 202 Ky. Admin. Regs. 7:501 § 3(11)-(12)).

The panel convened on July 5, 2012, with Questcare management in attendance. The panel was comprised of: Michael Poynter, Joe Prewitt, Michael Gribbin, and Dr. Tim Price. *See id.* at 4–5 ¶¶ 17–20. The panel gave Questcare the opportunity to speak, questioned Questcare management about its service and vehicles, and heard testimony from KBEMS investigators who conducted the June 18 inspections. *See* No. 12-92, R. 18-1 at 2; No. 12-91, R. 18 at 11 ¶ 59. During its time for response, Questcare presented an oral version of its plan to correct the deficiencies it had not yet fixed. Questcare asserts that the lack of adequate notice hampered its preparation and presentation of its proposal. *See* No. 12-92, R. 18 at 11 ¶ 59. After hearing the evidence, the panel immediately suspended License No. 2023, which covered Questcare's service in Martin County. *See* No. 12-92, R. 18-2 at 3 ¶ 11. The panel withheld judgment on the remaining four licenses, deciding to reconvene the hearing on August 2, 2012, after conducting another inspection in late July. *See* No. 12-92, R. 18 at 11–12 ¶¶ 63–64.

That inspection occurred on July 24, 2012. No. 12-92, R. 18-2 at 4 ¶ 7. Investigators ordered Questcare to present fifteen vehicles for inspection at the community college in Prestonsburg, Kentucky. *Id.*; No. 12-92, R. 18 at 12 ¶ 64. Questcare asserts that this is a violation of Kentucky regulations, which require "on-site inspections." No. 12-92, R. 18 at

3

12 ¶ 65 (quoting 202 Ky. Admin. Regs. 7:501 § 3(9)).  Twelve of the fifteen ambulances passed free and clear, and two more were approved that day after minor repairs.  No. 12-92, R. 18-2 at 4 ¶ 7.  So Questcare had fourteen "operative ambulances" at the end of the July 24 inspection.  *Id.*  KBEMS compiled a "Statement of Deficiencies" from the inspection, but Questcare did not receive a list of those alleged violations before the panel's August 2 hearing.  No. 12-92, R. 18 at 12 ¶¶ 66–67.

***Second Hearing and Suspension Order:***  The panel reconvened as planned on August 2, 2012.  *Id.* at 12 ¶¶ 67–68.  While KBEMS presented evidence, No. 12-92, R. 18-2 at 4 ¶ 11, Questcare's members were not given an opportunity to speak, No. 12-92, R. 18 at 12 ¶ 70.  The panel concluded the hearing at 12:30 p.m. and at 12:46 p.m. faxed a five-page "Order of Immediate Temporary Suspension" for Questcare's remaining four licenses.  *Id.* at 12 ¶¶ 69–71.  Questcare asserts that the panel must have predetermined the outcome of the August 2 hearing in order to issue a written order of that length in just sixteen minutes.  *Id.* at 12 ¶¶ 71–72.

Despite the fact it appears to have been prepared in advance, the panel's emergency order provided only a slapdash justification for suspending Questcare's license.  Kentucky law requires these orders to set forth findings of fact as well as conclusions of law.  Ky. Rev. Stat. § 13B.125.  And only a conclusion that suspending Questcare's licenses was "necessary in order to protect the public" can justify a temporary suspension.  *Id.* § 311A.075(1) (substantive standard).  To that end, the panel made three written findings of fact:

- Multiple ambulances on those five licenses failed inspection on more than one occasion due to bald tires, failed air conditioning, failure of emergency lights, [and] lack of cleanliness . . . .

4

- Four employees failed the continuing education audit.
- One license has not had any runs conducted on it for one year despite the 24/7 requirement in regulation.

No. 12-92, R. 18-1 at 3.  The panel then laid out a chain of reasoning that provided few links between these three findings and its conclusion that suspension was necessary to protect the public.  Rather than explain how these particular conditions represented a danger to the public, it determined that these three findings showed "that the acts with which [Questcare] has been charged are serious and reasonably relate to the provisions governing the provision of EMS services."  *Id.*  From that determination, the panel concluded—with no further explanation—that it was "therefore necessary to immediately suspend [Questcare's] licensure in order to protect the public's health, safety or welfare."  *Id.*  This was the first time in more than seven years that a panel suspended a private emergency transporter's license in Eastern Kentucky.  No. 12-92, R. 18 at 11 ¶ 58.

*Administrative Appeal:*  Questcare filed an appeal, which was heard on August 17, 2012.  *Id.* at 14 ¶ 82.  Hearing officer Stuart Cobb reviewed the evidence presented to the panel and heard testimony from panel member Timothy Price, M.D. about his decision.  *Id.* at 14 ¶¶ 82–85.  Cobb ultimately found that, for Questcare's four active licenses, there was no "substantial evidence of a violation of law which constitutes an immediate danger to the public health, safety or welfare."  No. 12-92, R. 18-2 at 6–7 ¶¶ 19–23.  He stressed that Questcare had fourteen "roadworthy ambulances," and that there was "no substantial evidence" that Questcare:  (1) could not meet its obligations with those fourteen ambulances, or (2) ever transported patients in deficient ambulances.  *Id.* at 6 ¶ 20.  Cobb also pointed out that Questcare had taken steps to ensure its employees' certification status would stay up to

5

date, and that "prior use of uncertified employees in violation of the law does not constitute an immediate danger to the public." *Id.* at 6 ¶ 22. He did, however, affirm the panel's decision to suspend Questcare's license for Martin County. *Id.* at 6–7 ¶ 23. Questcare points out that they do not make ambulance runs in Martin County. No. 12-92, R. 16 at 6.

 ***Alleged Improprieties:***  According to Questcare, numerous improprieties by KBEMS and the panel members suggest that the August 2 decision was not made in good faith. *See* No. 12-92, R. 18. Some have already been mentioned: (1) twice failing to give Questcare adequate notice of its alleged violations, *id.* at 10–11 ¶¶ 50–56, 12 ¶ 67; (2) violating Kentucky law's on-site inspection requirement, *id.* at 12 ¶ 65; (3) denying Questcare an opportunity to speak at the August 2 hearing, *id.* at 12 ¶ 70; and (4) predetermining the outcome of Questcare's case before the August 2 hearing, *id.* at 12 ¶¶ 69–72. Questcare also alleges that: (5) Prior to the panel hearing, two panel members told Questcare's president that they believed "there were too many private ambulance companies in Eastern Kentucky." *Id.* at 14 ¶ 80. (6) Most of the deficiencies that the panel cited were fixed before the August 2 hearing, and none posed an immediate threat to "the health or safety of the public." *Id.* at 12 ¶ 68. (7) The panel did not connect specific violations to particular licenses, even though ambulances are assigned to specific licenses and none of the Floyd County ambulances had any alleged deficiencies. *Id.* at 13 ¶¶ 73–74. (8) The panel never addressed Questcare's proposal for correcting its mistakes. *Id.* at 11 ¶ 62. (9) Dr. Price testified at the appeal hearing that he voted to suspend Questcare's license based on allegations that were not in the panel's findings of fact and had no substantial evidence to support them. *Id.* at 14, ¶¶ 83–84; No. 12-92, R. 18-2 at 5 ¶¶ 13–15.

6

The plaintiffs filed two suits in federal court following the panel's August 5 temporary suspension order.  The first, brought by Questcare and its four subsidiary companies (collectively referred to as "Questcare"), alleges that the four panel members violated their procedural and substantive due process rights under the Fourteenth Amendment.  *See* No. 12-92, R. 18 at 15 ¶ 88.  The second, brought by four Questcare employees as representatives of a class, alleges that the same three panel members deprived them of their procedural and substantive due process rights under the Fourteenth Amendment.  *See* No. 12-93, R. 18 at 13–14 ¶¶ 79–80.  The defendants moved to dismiss both complaints, No. 12-92, R. 8; No. 12-93, R. 7.

## DISCUSSION

### I.   Motions to Amend the Complaints

The Court must initially address the plaintiffs' motions for leave to amend their complaints, which were filed in response to the defendants' motions to dismiss.  No. 12-92, R. 17; No. 12-93, R. 17.   Because there is no reason to believe that the motions are improperly motivated or will prejudice the defendants, the plaintiffs must be given leave to amend.

The window has closed on the plaintiffs' opportunity to amend their complaints as a matter of right.  The plaintiffs filed their motions to amend sixty-nine days after serving their complaints and forty-five days after receiving the defendants' motions to dismiss.  *See* No. 12-92, R. 1, R. 8, R. 17; No. 12-93, R. 1, R. 7, R. 17.  Thus, the twenty-one-day period for amending their complaints as a matter of right had lapsed.  *See* Fed. R. Civ. P. 15(a)(1)(A), (B).  While the parties did agree to extend the plaintiffs' deadline to file their responses to the

motions to dismiss twice, those motions made no mention of the deadline to amend their complaints. *See* No. 12-92, R. 10, R. 11; No. 12-93, R. 8, R. 10. The deadlines to respond to a motion to dismiss and to amend a complaint are separate and distinct—a motion to extend one does not implicitly extend the other. *See Webb v. Republic Bank & Trust Co.*, No. 3:11-cv-423-TBR, 2012 WL 2254205, at *2 (W.D. Ky. June 15, 2012) (collecting cases).

Without a right to amend, the plaintiffs may amend their complaint only with the defendant's written consent or the Court's leave. Fed. R. Civ. P. 15(a)(2). Since the defendants have not given such consent, it falls to the Court to grant the plaintiffs' leave to amend—but only if "justice so requires." Fed. R. Civ. P. 15(a)(1), (2).

The plaintiffs justify their motions on two grounds. First, the complaints set forth facts that came to light through their administrative appeal and the appeals decision, which both occurred after they filed their original complaints. No. 12-92, R. 17 at 2; No. 12-93, R. 17 at 2. Second, both complaints' amendments "address the objections raised by Defendants in their motion to dismiss." No. 12-92, R. 17 at 2; No. 12-93, R. 17 at 2.

These reasons justify granting leave to amend at the outset of both cases. The amendments further the plaintiffs' constitutional claims by adding substance and precision to their allegations. *See Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006) (explaining that leave would be granted if the proposed amendment would "further the [plaintiff's] constitutional claims"). Moreover, the defendants did not object to either motion to amend. And the Court's review of the record reveals no reason to believe the amendments were brought with improper motive or will result in undue prejudice to the defendants. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) ("To deny a motion to

8

amend, a court must find at least some significant showing of prejudice to the opponent." (internal quotation marks omitted)).  The Court will therefore grant both motions and apply the motions to dismiss to the amended complaints.

## II.   Section 1983 and Damages Claims Against State Officials

Section 1983 creates a cause of action against those who, acting under color of state law, violate a plaintiff's federal rights.  *See* 42 U.S.C. § 1983; *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).

The plaintiffs concede that the Eleventh Amendment bars any award against Kentucky state officials.  *See* No. 12-92, R. 16 at 4 n.3 (acknowledging that both original complaints mistakenly named the defendants in their official capacities); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (treating official-capacity claims as claims against the government itself).  Thus, their only remaining claims are brought against the defendants in their individual capacities.  No. 12-92, R. 18 at 4–5 ¶¶ 17–20; No. 12-93, R. 18 at 3–4 ¶¶ 12–15.  A properly pleaded individual-capacity claim must allege two elements:  (1) the defendant acted under color of state law; and (2) the offending action deprived the plaintiff of a federal right, privilege, or immunity.  *See, e.g.*, *Harris v. Olszewski*, 442 F.3d 456, 460 (6th Cir. 2006).  Since the defendants do not dispute that they acted under color of state law, the issue is whether the plaintiffs have alleged an actual violation of their federal rights.

## III.   Questcare's Complaint

The defendants argue that they are entitled to qualified immunity from the plaintiffs' procedural and substantive due process claims.  No. 12-92, R. 8 at 11–13.  Qualified immunity is an affirmative defense for government officials who, like the panel members,

face damage claims for their performance of discretionary functions. *See Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To rebut the assertion of qualified immunity, Questcare must show that: (1) the defendants' conduct violated a constitutional right, (2) which was clearly established at the time of the defendants' conduct. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overturning the mandatory order set by *Saucier* and granting courts the discretion to decide which prong to address first). The Court views the facts in the light most favorable to the plaintiff, but the ultimate burden of burden of demonstrating that qualified immunity does not apply rests with the plaintiff. *See Saucier*, 533 U.S. at 201; *see also Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (holding that the ultimate burden lies with the plaintiff). Questcare has not carried its burden on either of its constitutional claims.

### A.   The Defendants Did Not Violate Questcare's Procedural Due Process Rights

A procedural due process claim must assert: (1) a life, liberty, or property interest protected by the Due Process Clause; (2) a deprivation of that interest; and (3) a lack of adequate process. *See Fields v. Henry County*, 701 F.3d 180, 185 (6th Cir. 2012) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). Questcare did have a property interest in its ambulance licenses, and the defendants did deprive it of that interest by suspending those licenses. But given Kentucky's compelling need to protect public health and safety, due process did not require the state to provide a pre-suspension hearing. Since no hearing was required, any flaws in the hearing that Questcare did receive are—for purposes of procedural due process—irrelevant.

10

**Property Interest:** Questcare had a property interest in its licenses because Questcare relied on them, and Kentucky law protected that reliance by limiting the panel's ability to suspend them. Questcare depended on its issued licenses to sustain its business. *See* No. 12-92. R. 18 at 3 ¶ 11. Such a reliance interest requires "some due process protections" when a license is suspended. *See Kratt v. Garvey*, 342 F.3d 475, 483 (6th Cir. 2003) (finding property interest in pilot's license (citations omitted)); *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 411 (6th Cir. 2002) (finding that ambulance company "does possess a protected property interest in its license to operate ambulances"); *Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that motorists have a due process interest in driver's licenses in part because licenses "may become essential in the pursuit of a livelihood"). So the nature of Questcare's reliance was sufficiently weighty to justify protection under the Due Process Clause.

And Kentucky law protected Questcare's reliance interest by limiting the panel's discretion to temporarily suspend ambulance licenses to those cases where "immediate temporary suspension is necessary in order to protect the public." Ky. Rev. Stat. § 311A.075(1). That substantive limitation on the panel's discretion creates a "legitimate claim of entitlement to the continued enjoyment of ambulance licenses" that deserves procedural protection under the Due Process Clause. *Med Corp.*, 296 F.3d at 412 (citing *Barry v. Barchi*, 443 U.S. 55, 64 (1979)). This is true even though the suspension was only temporary pending the outcome of Questcare's appeal. *See Barry*, 443 U.S. at 66 (explaining that the "severe" consequences of even a temporary suspension of a horse trainer's license implicated procedural due process); *see also Lee v. City of Newport*, 947 F.2d 945, at *5 (6th

11

Cir. 1991) (unpublished table decision) (stressing the same implication for a "temporary suspension or revocation").

*Deprivation of the Property Interest:* The panel's temporary suspension of Questcare's license obviously deprived Questcare of its property interest. *See Kratt*, 342 F.3d at 483 (treating temporary suspension of a license as a deprivation of the individual's property interest in that license); *see also Med Corp.*, 296 F.3d at 412 (explaining that "[a]ctions taken by the State which destroy the value or utility of a protected property interest constitute a Fourteenth Amendment deprivation of that interest" (quoting *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1153 (10th Cir. 2001))).

*Lack of Adequate Process:* Questcare argues that it was not afforded constitutionally required due process because of the numerous problems with the two hearings it received before the panel's suspension order. For example, Questcare claims that KBEMS failed to provide adequate notice before both hearings and that the panel denied Questcare an opportunity to be heard at the second. *See* No. 12-92, R. 18 at 10–12, ¶¶ 50–56, 67, 70. But if procedural due process did not require any pre-revocation hearing whatsoever, the flaws in the hearings Questcare did receive are constitutionally irrelevant. *See Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006) (holding that, where the Due Process Clause does not require a pre-revocation hearing, "the disputed facts [of the particular case] are irrelevant to the procedural-due-process claim"). So the first question the Court must ask is whether the Due Process Clause requires Kentucky to provide a pre-revocation hearing before temporarily suspending an ambulance license. *See Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (explaining that procedural due process analysis examines "what process the

State provided, and whether it was constitutionally adequate").  Given the overriding interest that Kentucky has in protecting public safety, the answer is "No."  Kentucky law requires the KBEMS panel to make findings of fact and conclusions of law before temporarily suspending a license, and it guarantees a timely administrative hearing to appeal a suspension.  That procedural scheme satisfies due process under the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976).

The Court's analysis turns on whether the general procedures Kentucky law establishes for suspending licenses are constitutionally satisfactory.  Whether the panel's decision was right or wrong in this particular case is irrelevant.  *See Camuglia*, 448 F.3d at 1222.[3]

Kentucky law provides some process before revocation and a full adversarial proceeding if a licensee wishes to appeal a suspension.  The KBEMS panel had discretionary authority to issue an immediate temporary suspension of an ambulance license where it is "necessary in order to protect the public."  Ky. Rev. Stat. § 311A.075.  The panel's written order must "contain findings of fact and conclusions of law" supporting its order.  *Id.* § 13B.125(2).  Requiring government officials to make certain findings before suspending a license, even if those findings are ex parte, is a form of pre-deprivation process.  *See Barry*, 443 U.S. at 64–65 (finding that the requirement that, prior to temporarily suspending a horse trainer's license, state officials establish probable cause to believe that a horse was drugged

---

[3] Questcare's attempt to characterize the Supreme Court's decisions in *Barry* and *Mallen* as turning on the accuracy of the particular pre-deprivation findings that officials made in those cases cannot be squared with the Supreme Court's later decisions.  *See* No. 12-92, R. 16 at 2–3.  Both *Hudson* and *Zinermon* make it clear that procedural due process analysis asks whether the procedures applied were sufficient as a general rule, not whether the particular decision made based on those procedures was correct.  *See Zinermon*, 494 U.S. at 126; *Hudson v. Palmer*, 468 U.S. 517, 534 (1984).

13

and its trainer was at least negligent in regard to the drugging was "all the process that was due [] prior to the suspension of [the] license"). If the panel issues an emergency suspension order, the license holder may appeal the panel's decision. Ky. Rev. Stat. § 13B.125(3). A full administrative hearing must be held within ten days of the license holder's request for a hearing, and a written opinion must issue within five days of that hearing. *Id.* Either party may then appeal to the Kentucky Circuit Court. *Id.* § 13B.125(4).

To determine whether this scheme satisfies due process, the Court must consider the three factors set out in the *Mathews* balancing test. *See Kratt*, 342 F.3d at 482–85 (applying *Mathews*, 424 U.S. 319). Those are: (1) the private interest that the agency's action affects; (2) the risk of erroneously depriving that interest under the current procedure and whatever probable value additional or substitute safeguards would create; and (3) the government interest implicated by those procedural schemes. *Mathews*, 424 U.S. at 335.

Even if the Court assumes that the first two factors favor a pre-revocation hearing, Kentucky's interest in protecting health and public safety means that the third factor weighs decisively against a hearing. Kentucky granted the panel power to temporarily suspend ambulance licenses to address "immediate danger to the public health, safety, or welfare." Ky. Rev. Stat. § 13B.125(2). The Supreme Court has repeatedly held that, where such grave interests are implicated and the state must act quickly, due process does not require a pre-deprivation hearing. *Gilbert v. Homar*, 520 U.S. 924, 930–31 (1997) (collecting cases); *see also Dixon*, 431 U.S. at 114 (stressing the "important public interest in safety on the roads and highways, and in the prompt removal of a safety hazard"). In such cases, limiting an official's discretion to create "a substantial assurance that the deprivation is not baseless or

14

unwarranted" and providing prompt administrative review following the revocation is sufficient. *Homar*, 520 U.S. at 931 (quotation omitted).

Kentucky's established procedure follows that scheme and thus satisfies due process. While there may be some risk of erroneous deprivation, that risk is not intolerable. Kentucky law requires the panel to make a determination—based on factual findings and legal conclusions—that immediate suspension was "necessary in order to protect the public." Ky. Rev. Stat. § 311A.075. That requirement provides "substantial assurance" that the panel had a reasonable basis for acting. *Homar*, 520 U.S. at 931 (quotation omitted); *Barry*, 443 U.S. at 64–66 (holding that statute requiring probable cause before issuing interim suspension was sufficient so long as the post-revocation hearing was prompt). And Kentucky's interest in removing unsafe vehicles from the roads weighs decisively in favor of relying on a post-revocation hearing. These are vehicles that people's health—and often their very lives—depend on. Ambulances travel at high speeds, often through rural parts of Kentucky. A breakdown could be the difference between life and death. Due process does not require a pre-revocation hearing where the stakes are much lower: seizing unsafe food, closing down a restaurant after finding health code violations, or impounding potentially rabid animals after they attacked a child. *See North Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315 (1908) (permitting seizure of unsafe poultry); *Camuglia*, 448 F.3d at 1219–22 (permitting closure of restaurant); *Clark v. City of Draper*, 168 F.3d 1185, 1189–90 (10th Cir. 1999) (permitting impounding of potentially rabid foxes). It follows that due process does not require a pre-revocation hearing here. Holding otherwise would hamstring the government's ability to act quickly to protect health and public safety. Finally, Questcare's

15

interest in its license was not overriding.  If a state's interest in "preserving the integrity" of horseracing justifies temporarily suspending a trainer's license after his horse fails a drug test, then Kentucky's interest in its citizens health and safety justifies temporarily suspending an ambulance license based on written findings that the suspension is necessary.  *Barry*, 443 U.S. at 64–66.  Those procedures were applied in this case:  The panel issued written findings citing multiple safety violations over the course of three inspections.  *See* No. 12-92, R. 18-1 at 3.  Whether the panel was ultimately correct in issuing the temporary order is a matter of state law.

But what about the fact that the panel provided Questcare with two pre-revocation hearings before it ultimately issued its temporary suspension?  The fact the panel waited almost a month between hearings certainly seems to undercut the notion that this was a situation "where a State must act quickly."  *Homar*, 520 U.S. at 930.  The short answer is that procedural due process rights do not turn on the propriety of the government's decision in an individual case. *See Camuglia*, 448 F.3d at 1222.  They turn on the general procedures that states establish. *See Zinermon*, 494 U.S. at 126, 128 ("[I]t is necessary to ask what process the State provided, and whether it was constitutionally adequate.  This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law."); *Hudson v. Palmer*, 468 U.S. 517, 534 (1984) ("The controlling inquiry is solely whether the state is in a position to provide for predeprivation process.").  And in cases where a state-issued license is tied directly to public health and safety, the Supreme Court has repeatedly held that no pre-revocation hearing is necessary.  Whether the panel followed

16

Kentucky law in Questcare's case does not determine the existence of a procedural due process right. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 640–41 (6th Cir. 2005) (holding that the fact a state official failed to follow state-law requirements does not necessarily implicate federal due process (citing *Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir. 1976))). Neither does the accuracy of the panel's substantive conclusions. Procedural due process rights do not wax and wane depending on whether the government's decision was correct in a given case. *Camuglia*, 448 F.3d at 1221–22.

Questcare did not have a procedural due process right to a pre-revocation hearing. Consequently, the defendants are entitled to qualified immunity because their actions during the pre-revocation hearing did not violate Questcare's constitutional rights. *See Saucier*, 533 U.S. at 201.

### B.   Even if Questcare Had a Procedural Due Process Right, That Right Was Not Clearly Established

The defendants argue that they are shielded by qualified immunity because they did not violate any "clearly established right" of Questcare's. No. 12-92, R. 8 at 12. Questcare's procedural due process right was "clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002)). That is certainly not the case here.

Questcare does not identify any cases definitively requiring a pre-revocation hearing in a case like this one. What's more, courts have repeatedly held that, where public health and safety issues are implicated, statutory schemes like Kentucky's satisfy due process. *See,*

17

*e.g.*, *Barry*, 443 U.S. at 64−66; *Dixon*, 431 U.S. at 113; *Camuglia*, 448 F.3d at 1219−22; *Kratt*, 342 F.3d at 483−84 (collecting cases); *Clark*, 168 F.3d at 1189−90.  Thus, Questcare had no "clearly established" procedural due process right to a pre-revocation hearing. *Saucier*, 533 U.S. at 202.  The defendants' qualified immunity therefore shields them from any liability for the procedural due process claim.

      **C.**     **Substantive Due Process**

      A single sentence in Questcare's amended complaint alleges that the defendants' actions violated Questcare's right to substantive due process.  *See* No. 12-92, R. 18 at 15 ¶ 88(E).  The property interests protected by substantive due process are "much narrower that those protected by procedural due process."  *Bell v. Ohio State Univ.*, 351 F.3d 240, 249−50 (6th Cir. 2003).  So it does not necessarily follow that Questcare had a substantive due process interest in its licenses simply because it had a procedural due process interest in them.  Rather, Questcare has the burden of showing it had a substantive due process right that was clearly established at the time the defendants allegedly violated it.  *See Sheets*, 287 F.3d at 586.  Since Questcare has not demonstrated that its asserted right was clearly established, the Court need not decide whether Questcare actually has such a right.  *See Callahan*, 555 U.S. at 236 (holding that district courts have discretion to analyze the "clearly established" prong first).

      All Questcare offers in support of its substantive due process allegation is the claim that it has a constitutional right against "official acts that are unreasonable and arbitrary." No. 12-92, R. 16 at 8 (quoting *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994). Such a sweeping assertion cannot carry Questcare's burden.  Substantive due process rights

protect against "*certain* government actions." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (emphasis added). And Questcare presents no specific reasons as to why there is a clearly established substantive due process right against this particular governmental action—an administrative body temporarily suspending a professional license.

Perhaps Questcare means to analogize to prior cases addressing zoning regulations, where the Sixth Circuit has held that there is a right against "arbitrary and capricious" zoning decisions. *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 861−62 (6th Cir. 2012) (collecting cases). But those cases are grounded in Supreme Court precedent recognizing a specific substantive due process right to be free from arbitrary zoning decisions. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1220 & n.48 (6th Cir. 1992) (collecting Supreme Court cases). Questcare presents no reasoning as to why that principle should be extended to this case, which involves discretionary decision making by an administrative licensing board. Furthermore, when government officials' discretionary decision making is at issue the Sixth Circuit has insisted that the liberty or property right at issue be "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990) (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 122 (1989) (plurality opinion)). And Questcare offers no authority suggesting that its ambulance licenses create an interest that is rooted in any such tradition.

Without any showing from Questcare that it had a property interest protected by substantive due process, the Court cannot say that it had a "clearly established" right at the time of the alleged violation. Holding Questcare to that showing is especially important given that its claim involves substantive due process. Federal courts should not employ a

19

freewheeling substantive due process analysis and deem every government action that the court finds unreasonable and arbitrary unconstitutional.   Doing so would usurp the policymaking role of the political branches, depriving citizens of the freedom to resolve such issues in the political arena.  *See Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and quotations omitted) (explaining that courts should be reluctant to create new procedural due process rights because that decision can only be reversed through a constitutional amendment).  It would also transform the Due Process Clause into a vehicle of state administrative law, violating the principle of comity underlying our system of judicial federalism.  *See Bell*, 351 F.3d at 251; *see also Austell v. Sprenger*, 690 F.3d 929, 937 (8th Cir. 2012) ("Such a doctrine would turn every state-law violation into a substantive due process claim, a result that would obliterate completely the distinction between state law and the federal Constitution." (quotation omitted)).

Similarly, Questcare cannot carry its burden by simply alleging that the defendants' actions "shock the conscience."  No. 12-92, R. 18 at 15 ¶ 88(E).  To shock the conscience in the constitutional sense, the defendants' behavior must have been "so shocking as to shake the foundations of this country."  *EJS Props.*, 698 F.3d at 862; *see also Vasquez v. City of Hamtramck*, 757 F.2d 771, 773 (6th Cir. 1985) ("A citizen does not suffer a constitutional deprivation every time he is subject to the petty harassment of a state agent.").  Questcare does not identify any decisions that clearly establish that the conduct here met this extremely high bar.  Permitting Questcare to carry its burden on such a bare allegation under a "shock the conscience" analysis would create problems similar to those spawned by the freewheeling "arbitrary and unreasonable" analysis discussed above.  Federal judges would

20

usurp the role of the legislature and the state courts by constitutionalizing the issue.  But this time, the even vaguer "shock the conscience" test would magnify the judicial intrusion.  *Cf. Collins v. Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

Given Questcare's serious burden, "[i]t is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  Questcare's burden was to identify specific precedent that clearly established a substantive due process right in its licenses.  Citing two cases articulating the general rule, without demonstrating how they clearly establish a substantive due process right, does not satisfy that burden.  *See* R. 16 at 8 (citing *Hescott* and *Harris*).  Therefore, qualified immunity shields the defendants from any liability for the substantive due process claim, and the claim must be dismissed.

## IV.   Motion to Exclude Matters Outside the Pleadings

After the initial briefing, Questcare moved to "exclude all non-pleading matters from the Defendants' Reply Memorandum and the attached Exhibits."   R. 20 at 5 (seeking exclusion of R. 19 and R. 19-1–6).  The motion does not identify which items contained in those seventy-two pages it wants the Court to exclude.  *See* R. 20.  This vague request asks the Court to do the work that Questcare's attorneys should have done:  define the scope of the pleadings and then sift through the reply brief and attachments to identify the "non-pleading matters."  *Id.* at 5; *cf. Wimbush v. Wyeth*, 619 F.3d 632, 638 n. 4 (6th Cir.2010)

(stating, in the summary judgment context, that parties may not simply dump "a pile of paper on the district judge's desk" but rather have an obligation "to point to the evidence with specificity and particularity"). Ruling on the motion would risk wronging both parties. The Court must sift through those seventy-two pages and decide what is outside the pleadings. This is unfair to the defendants because the Court would assume the role of plaintiffs' counsel. And it is unfair to the plaintiffs because the Court could exclude items the plaintiff did not actually wish to exclude.

Luckily, there is a way out in this case. Since the Court did not consider any matters outside the pleadings, it can forego an item-by-item ruling on the motion to exclude. *Cf. Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966) (holding that district courts, when addressing a dispositive motion, may forego directly ruling on a pending motion to strike and instead resolve the dispositive motion by relying on their discretion to exclude inadmissible material). As explained above, the particular facts of KBEMS's investigation and the panel's decision do not affect the Court's procedural due process analysis. *See* Section III *supra*. And the Court cited to only those events and actions referenced in Questcare's claim. *See id.* So the Court did not "consider" any of the facts in the reply brief or its attachments in deciding the motion to dismiss. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (explaining that the rule barring matters outside the pleadings applies to the decision whether to grant the Rule 12(b)(6) motion). Given that an item-by-item ruling on the motion to exclude would be an unnecessary waste of judicial resources, the Court will not give one.

V.     **The Employees' Complaint**

Several of Questcare's employees have filed a class-action suit that is effectively a carbon copy of Questcare's suit.  *See* No. 12-93, R. 17.  They name the same defendants and assert the same legal theory.  Only this time, their claim is for the wages and benefits they lost after being terminated, not for Questcare's lost revenue.  *Id.* at 14 ¶ 80(A).  The constitutional rights their suit asserts belong to Questcare—not its employees.  And Questcare is more than capable of asserting its own rights.  The employees therefore have no claim of their own and no standing to bring suit on Questcare's behalf.

***Due Process:***  To state a due process claim of their own, whether procedural or substantive, the employees must identify a personal property interest that is (1) implicated in this case and (2) protected by the Due Process Clause.  *See Fields*, 701 F.3d at 185 (procedural due process); *Charles*, 910 F.2d at 1353 (substantive due process).  They have not done so.  The ambulance license belonged to Questcare and its subsidiaries—not its employees.  Similarly, the property interest the employees assert in their wages and benefits are based on their relationship with their employer, Questcare.  *See* No. 12-93, R. 17 at 2.  As a private employer in Kentucky, Questcare can fire its employees at any time for almost any reason.  *Mitchell v. Univ. of Kentucky*, 366 S.W.3d 895, 898 (Ky. 2012).  If the employees have no claim to continued employment from Questcare, they certainly have no "legitimate claim of entitlement" against the State that would create a procedural due process right.  *Richardson v. Twp. of Brady*, 218 F.3d 508, 517 (6th Cir. 2000) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  The employees' substantive due process claim falls for the same reason.  If Kentucky, as most other states, allows employees to be fired at will, then the

right to future earnings and benefits is not "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Charles*, 910 F.2d at 1353 (quoting *Michael H.*, 491 U.S. at 122 (plurality opinion)). Thus, the employees have failed to state a claim based on any due process right they personally hold.

**Third-Party Standing:** In the alternative, the employees argue that they should be permitted to raise Questcare's rights under the doctrine of third-party standing. *See* No. 12-93, R. 16 at 2−4; *see also Kowalski v. Tesmer*, 543 U.S. 125, 128−30 (2004) (collecting cases applying the doctrine). The employees may only do so if their suit satisfies two criteria. First, they must have "a 'close' relationship" with the third party whose rights they assert. *Boland v. Holder*, 682 F.3d 531, 537 (6th Cir. 2012) (quoting *Kowalski*, 543 U.S. at 130). Second, there must be a "hindrance" to the third party's ability to protect its own interests. *Id.* The employees' suit clearly does not satisfy the second criterion.

As Section III illustrated, Questcare is more than capable of asserting its own rights. Nevertheless, the employees' assert that "there is no assurance that Questcare will recover, or has the right to recover, the[ir] wages and benefits." No. 12-93, R. 16 at 3. This argument misunderstands the exception for third-party standing. The "hindrances" that the third-party-standing doctrine recognizes are obstacles to bringing the suit itself. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (finding that the chilling effect and mootness issues that women asserting their abortion rights might face in bringing suit justified third-party standing for doctors). Whether Questcare ultimately prevails, or can recover the employees' lost wages and benefits, does not matter. The third-party standing doctrine exists as a platform for claims that, due to practical barriers the first-party plaintiff faces, may not

24

otherwise have their day in court.  *See Kowalski*, 543 U.S. at 129–30.  Yet the employees' argument for third-party standing treats Questcare's claims as if those claims were merely a vehicle for the employees to recover their lost wages.  That reasoning turns third-party-standing doctrine on its head.

The fact that Questcare has effectively asserted its rights demonstrates that there is no need for the employees to raise those same rights in a second suit. The Court must therefore dismiss the employees' suit for lack of standing.

25

## CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1)    Questcare's Motion for Leave to Amend and Supplement the Complaint, Pikeville Civil Action No. 12-92, R. 17, is **GRANTED**.

(2)    The defendants' Motion to Dismiss Questcare's complaint, Pikeville Civil Action No. 12-92, R. 8, is **GRANTED**.

(3)    The employees' Motion for Leave to Amend and Supplement the Complaint, Pikeville Civil Action No. 12-93, R. 17, is **GRANTED**.

(4)    The defendants' Motion to Dismiss the employees' complaint, Pikeville Civil Action No. 12-93, R. 7, is **GRANTED**.

(5)    Questcare's motion to exclude matters outside the pleadings, Pikeville Civil Action No. 12-92, R. 20, is **DENIED**.

(6)    Both cases are **STRICKEN** from the Court's active docket and all other motions are **DENIED AS MOOT**.

This the 4th day of March, 2013.



Signed By:

**_Amul R. Thapar_** $\mathcal{AT}$

**United States District Judge**

26